**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>UNLOCKD MEDIA, INC.,<br><br>Debtor.<br><br>Tax I.D. No. XX-XXX2901 | Chapter 11<br><br>Case No. [00-00000 (XYZ)] |
| In re:<br><br>UNLOCKD OPERATIONS US INC.,<br><br>Debtor.<br><br>Tax I.D. No. XX-XXX0878 | Chapter 11<br><br>Case No. [00-00000 (XYZ)] |

**DECLARATION OF MATTHEW BERRIMAN PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND 11 U.S.C. §1116**

I, Matthew Berriman, pursuant to 28 U.S.C. §1746, do hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge as of October 24, 2018:

1. I am the sole director of both Unlockd Media, Inc. ("Media"), and Unlockd Operations US Inc. ("Operations", and to gather, that "Debtors"), the Debtors and Debtors-in-possession in the above-captioned case, for which we have requested procedural consolidation. I am also the cofounder of the Debtors' parent company and sole

shareholder, Unlockd Limited f/k/a Unlockd Media Pty. Ltd. ("Unlockd"), of which I am a major shareholder. As such, I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

2. On or about October 26, 2018, the Debtors are commencing cases by filing petitions for relief pursuant to chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Chapter 11 Cases"). The Debtors, upon filing, will be operating their businesses and managing their affairs as Debtors-in-Possession Pursuant to bankruptcy Code §§1107(a) and 1108. Currently, the Debtors are operating in a wind-down mode, but that could change depending on the outcome of litigation in these cases and in related cases in Australia and Great Britain. To date, no creditors' committee has been formed in these Chapter 11 Cases, and no trustee or examiner has been appointed. Utilizing the Bankruptcy Code to preserve its assets and reorganize its affairs offers the only avenue by which the Debtors could help to re-commence their businesses. The businesses of the Debtors are interrelated, and one cannot reorganize without the other reorganizing.

3. I submit this declaration (the "Declaration"), pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), to provide an overview of the Debtors, their business and the Chapter 11 Cases, as well as to support the Debtor's chapter 11 petitions and motions an applications seeking various types of relief upon commencement of the Chapter 11 Cases (collectively, the "First Day Motions"). I also submit this Declaration pursuant to Bankruptcy Code §1116 (1)(B) to indicate certain information that is unavailable in these small business cases. I have been

a director of both Debtors since their respective incorporations in 2015, and until recently was also an officer of both Debtors. As a result of my work with the Debtors, my review of relevant documents, my discussions with others familiar with the Debtors, as well as with the Administrators of the Debtors' parent company, I believe I am familiar with the Debtors' day-to-day operations, business affairs, financial affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein, and all facts set forth in the Declaration are based on my personal knowledge formed by my work, my discussions with others, my review of relevant documents, and/or my opinions based on my experience and knowledge of the Debtors' operations and financial conditions. In making this Declaration, I have relied in part on information and materials that the Debtors' advisors have gathered, prepared, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4. This Declaration is divided into four parts. Part I provides background information about the Debtors, their business, capital structure and the events leading up to the filing of the Chapter 11 Cases. Part II sets forth the relevant facts and considerations in support of the First Day Motions. Part III provides the specific information required by Local Bankruptcy Rule 1007-2. Finally, Part IV provides the specific information required by Bankruptcy Code section 1116 (1)(B).

## PART I

**A. History and Business of the Debtors**

5. I was a cofounder of Unlockd, an Australian company and the parent and sole shareholder of the Debtors, in 2014. Unlockd was conceived as a revolutionary media, technology and telecommunications business that benefits consumers, advertisers, and communication companies. Unlockd developed a unique app for mobile phones that offers users who sign up for the service relevant advertising, content or other offers based upon their demographics upon their unlocking their smartphone, and allows users who view such content to collect points which they can redeem for things like mobile phone credits, mobile data credits, premium entertainment content or loyalty points. The users of the Unlockd app benefitted from accumulating points which they could redeem for items they desired. Unlockd's telecom partners benefited from improved customer retention and acquisition as a consequence of the points program. And finally, Unlockd's major advertising partners received first access to consumers at their most engaged digital moment, the moment of unlocking their mobile phone.

6. In order for the business plan to work, Unlockd had to operate through a mobile advertising platform. Although Unlockd has utilized various platforms, most of its content utilizes Google Play Store and Google's advertising platform AdMob.

7. Unlockd was successful almost immediately, boasting such major advertising partners as Twitter, Yahoo, McDonald's, British Airways, Doritos and Uber. It soon expanded from Australia to Great Britain and other countries. In 2015, Unlockd decided to expand into the United States market and incorporated two Delaware corporations: Media and Operations, of which it is the sole shareholder. The offices of both are in New York City at 214 W. 29th St. The funding for these two Debtors came from the parent company, Unlockd. Operations was conceived as the operating company. All employees, payroll,

leases, and day-to-day operating issues were handled at the Operations level. Media was conceived as the contracting party which went out and secured advertising partners, entered into contracts, and collected all revenues. Media then funded Operations from the revenues it collected. Accordingly, while the Debtors have intracompany debt, they have no secured debt.

8. The Debtors began operating in the US in 2016. Although they have not been operating long enough to show a net operating profit, their business has been expanding steadily. Their largest trading partner was Sprint's Boost. The Debtors showed great promise, as did their parent and affiliated companies.

**B. Events Leading to the Chapter 11 Cases**

9. As the Debtors and their related companies were expanding rapidly across the globe to great consumer, advertiser and investor interest, the management of Unlockd determined to do a public offering on the Australian exchange in early 2018. This would allow the parent company to get a massive capital infusion, which in turn would allow it to inject capital into the Debtors and other affiliates, so that, they could grow.

10. There was great investor interest concerning the proposed public offering, and it was hyped by some financial pundits as potentially the most successful technology startup in the recent history of Australia. The future indeed looked rosy for both Unlockd and the Debtors, when suddenly Google made a public announcement that it was removing the Unlockd app from the Google Play Store and AdMob advertising network. Since these advertising networks carried the majority of the Unlockd family's advertising, this would be a devastating blow to Unlockd and its subsidiaries. Google claimed that the Unlockd apps violated the terms of use of the Play Store and AdMob advertising marketplace.

Unlockd has publicly taken the position that this is not true and that Google is merely trying to bury a potential advertising giant and competitor, in violation of various laws concerning competition and trade monopolies, or, as I understand it, what is referred to in the United States as antitrust. I believe that Unlockd's position is correct, and that Google deliberately meant to destroy the Unlockd family of companies through their actions.

11. Not being able to reach a compromise with Google, Unlockd took Google to court in both Australia and Great Britain seeking to enjoin Google from removing the Unlockd apps from the Google platforms. Unlockd was successful in both countries, and Google was enjoined from removing the apps; however, a lengthy lawsuit(s) against Google lays ahead to see if its destructive behavior can be permanently enjoined, and what damages are due to the Unlockd companies. Despite the success of the Australian and British entities in court, the bloom was off the rose. With Unlockd's future in question because of Google, the market quickly lost interest in Unlockd's stock offering, and it had to be pulled.

12. With no new infusion of capital, Unlockd found it difficult to finance its growing business, the search for an alternative to Google, and its lawsuits against Google. In addition, the confidence of its trading partners eroded; as, the future looked uncertain. As a consequence, on June 12, 2018, the parent company, Unlockd, entered into insolvency proceedings in Australia known as an Administration. This is similar to your chapter 11, but requires that an independent third party step in to administer the company.

13. After the Administration was filed, the Administrators searched for either an equity infusion or a buyer for Unlockd, but the uncertainties surrounding the Google situation made it impossible to interest anyone in investing or buying the company.

14. As the Australian parent, which previously had provided funding to its subsidiaries, weakened with no capital infusion in sight, the British subsidiaries began to struggle, as well. At the end of August, 2018, the two British subsidiaries, Unlockd Media Technology, Ltd., and Unlockd Media Operations, Ltd., had to file for Administration, as well.

15. All of this had a domino effect on the Debtors. Many of their resources came from the parent company, including the fact that most of its officers were on the Unlockd payroll. Without the support from the parent company, it could no longer sustain operations. In the past month, the contract with Sprint's Boost, Media's largest trading partner, was terminated. As the Debtors were still in a startup mode and had not yet shown a net operating profit, and have now lost their largest trading partner, they cannot continue to operate on a day-to-day basis without support from their affiliates absent a significant reorganization.  That Debtors have no employees at this time.

16. At this point, the Australian Administrator and the British Administrator are negotiating for litigation funding to pursue their causes of action against Google. Their success in doing so has significant ramifications for the Debtors. The Debtors believe they have independent causes of action against Google, and may either be included in a suit brought by one of their affiliates, or may bring an independent action. If the litigation is successful, there will be ample funds with which to reorganize. In the meantime, the main purpose of these Chapter 11 Cases is to preserve the assets of the Debtors and to collect the receivables of Media. The path to reorganization will be determined ultimately by the success, or lack thereof, of the related companies' restructuring and litigation efforts.

**C. Debtors' Capital Structure**

17. Neither of the Debtors has any secured debt. Neither Debtor has an obligation for borrowed money to any third party who is not an insider.

18. Each of the Debtors has issued 1000 shares of common stock, $0.001 par value, to its sole shareholder, Unlockd. None of the Debtors' securities are publicly held, nor do any officers or directors hold any of the Debtors' securities.

19. Both Debtors have considerable intercompany transactions with affiliates. In the year prior to filing, Operations transferred $39,500 to related companies. In that same period of time, Media transferred $1,431,554.38 to Operations. Operations carries $112,302 on its books as notes receivable from affiliates. These are unlikely to be collectible. Media carries $3,440,115 on its books as notes receivable from affiliates, of which $3,171,476 is from Operations. Since operations is structured not to receive revenues, it is unlikely that this will ever be collectible. Although at this time, the Debtors are only asking for procedural consolidation, given the structure and intercompany debt between the two Debtors, I have asked my counsel to explore whether substantive count consolidation is appropriate.

20. The greatest asset of the Debtors by far is their potential causes of action, which are of an unknown value. In addition, they both have tax loss carry forwards, the value of which is uncertain. In addition to these items, Operations has assets valued at approximately $166,275.87 plus some personal property of negligible value. It has liabilities, including intercompany liabilities, of $5,489,341.49. Media has assets of $231,464.86. Media has liabilities, including intercompany liabilities, of $5,618,377.30.

21. Media's assets include approximately $55,750 in cash. Operation's assets include approximately $56,735 in cash. Some of the cash of the two Debtors may serve as cash

collateral for certain credit cards of the Debtors which are no longer in use. The Debtors are exploring terminating the collateral arrangement.

## PART II

## First Day Motions

22. In furtherance of these Chapter 11 Cases, the Debtors expect to file a few motions and applications on or about the same day as they commence the Chapter 11 Cases. I am referring to these pleadings as "First Day Motions". Since the Debtors are currently in a wind down mode, I understand that these pleadings do not have the urgency associated with typical first day motions. Nonetheless, I felt it was important to provide the Court with my rationale for filing these First Day Motions. I am familiar with each of the First Day Motions, and I believe that the relief sought in each one is vital to enable the Debtors to transition into chapter 11 and to maximize value during these Chapter 11 Cases.

**A. Debtors' Application to Retain Counsel**

23. The Debtors have filed an application for entry of an order authorizing the employment of Mayerson & Hartheimer, PLLC ("M & H"), effective as of the date of filing their respective petitions.

24. M & H has been working with the Debtors for several months now, and I know them to be highly competent bankruptcy counsel. In addition, they have developed a familiarity with the Debtors, their books, records, and financial situation. I believe that their knowledge of the Debtors and the Bankruptcy Code is critical to a successful outcome of these Chapter 11 Cases. I believe that their fees are in line with, or less than, the fees of bankruptcy professionals with similar credentials. The Debtors have extremely limited assets, and M & H have agreed to take on the case with this knowledge. I am not sure that

Debtors could find other qualified counsel willing to do so. They also agreed to cap their fees in the pre-petition phase. Accordingly, I believe that it is in the best interests of the Debtors, their estates and their creditors to have the services of M & H.

25. I am advised that M & H has discussed at length with Unlockd's Global Head of Legal Services, who provided legal services to all Unlockd affiliated companies, whether a conflict could arise between the Debtors. I am satisfied that there is currently no conflict between the Debtors, that one is not likely to arise, and that if M & H at any point determines that there is a conflict, they will immediately let me know. I believe there are economies if one law firm represents both Debtors, as, their businesses are intertwined. Accordingly, I believe it is in the best interests of the Debtors, their estates, and their creditors to have M & H represent both Debtors

**B. Debtors' Application to Retain Financial Advisor**

26. The Debtors have filed an application for entry of an order authorizing the employment of Vernon Consulting Inc. ("Vernon"), as their financial advisor, effective as of the date of their filing their petitions.

27. Vernon has been working with that Debtors for several months now. As the Debtors no longer have any employees, they would not have been able to pull together the financial information necessary to file these Chapter 11 Cases without the assistance of Vernon. Nor would the Debtors be able to discharge their duties in chapter 11, including filing Monthly Operating Reports, without the assistance of Vernon. To date, I have found them to be extremely competent and cost-effective, as well as very knowledgeable about the financial requirements of the Bankruptcy Code. I believe that their services are critical to a successful outcome of these Chapter 11 Cases. Accordingly, I believe that it is in the

best interest of the Debtors, their estates and their creditors to have the services of Vernon.

28. For the same reasons stated above with respect to M & H, I do not believe that there is a conflict with Vernon representing both Debtors. Indeed, I believe it would be redundant and unnecessarily expensive for each Debtor to hire their own separate financial advisor.

**C. Debtors' Motion for Procedural Consolidation**

29. The Debtors are also filing a motion to have these Chapter 11 Cases procedurally consolidated under one caption. It is my understanding that this will streamline procedures and save money by allowing the Debtors to file one motion or report in the future, whereas otherwise, they might each have to file a separate motion and report. As the Debtors have very limited resources, I am all in favor of anything that saves money and eliminates redundancies. I am also advised that a procedural consolidation is a procedural matter only, and does not affect the substantive rights of any party. I, therefore, believe that it is in the best interests of the Debtors, their estates and their creditors to allow procedural consolidation in these Chapter 11 Cases.

**D. Interim Compensation Motion**

30. I have been advised that it is very common at the outset of the case to seek entry of an order establishing procedures for interim compensation and reimbursement of professionals' expenses during a chapter 11 case. As the primary purpose of these Chapter 11 Cases is to preserve the assets of the Debtors until such time as a plan can be proposed based on the outcome of affiliates' restructurings, I do not anticipate that there will be sufficient activity in this case such that payment only once every hundred twenty days would constitute a burden on the professionals. Accordingly, the Debtors have not

requested an interim compensation procedure at this time. That Debtors, however, reserve the right to request interim compensation procedures later in these Chapter 11 Cases should they become appropriate.

## PART III

### Information Required by Local Bankruptcy Rule 1007-2

31. Local Rule 1007-2 requires certain information related to the Debtors which is set forth herein. The information required by Local Rules 1007-2 (a) (1), 1007-2 (a) (6), and 1007-2 (a) (7) is set forth in Part I above.

32. The Debtors submit that the information required by Local Rules 1007-2 (a) (2), 1007-2 (a) (3), and1007-2 (a) (5) is not required because, as set forth in Part I, these Chapter 11 Cases were not originally commenced under either chapter 7 or chapter 13; no committee of creditors has been organized prior to the date of the filing of the petitions; and there are no holders of secured claims against the Debtors.

33. With respect to Local Rule 1007-2 (a) (4), the Debtors submit that Official Form 204, List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders, has all of the information required by this Rule and was filed simultaneously with the Debtors' petitions.

34. Pursuant to Local Rule 1007-2 (a) (8), Operations submits that it has left office furniture, supplies and machines in its offices at 214 W. 29th St., Suite 705, New York, NY 10001. Such personal property is of nominal value. As there are no employees going to the office on a day-to-day basis, I am not sure whether such property is there or is under the control of the landlord. In addition, there is cash in the accounts of the Debtors which is denominated on their bank statements as "cash collateral". I believe this cash at one time

collateralized credit cards given to the Debtors' employees, but there are no longer such credit cards. The bank accounts and the credit cards were both with Silicon Valley Bank. That Debtors are looking into having this designation removed as it sets up the new debtor-in-possession bank accounts.

35. With respect to Local Rules 1007-2 (a) (9) and 1007-2 (a) (10), the Debtors have historically operated their businesses from 214 W. 29th St., Suite 705, New York, NY 10001. The Debtors currently have no need for the space, and the lease is quite expensive, but they still have some tangible assets of nominal value located there. In anticipation of terminating the lease, certain of the books and records have been removed to the offices of the Debtors' parent in Melbourne, Australia, at 111 Coventry Street, Southbank VIC 3006, Australia. Said books and records are of no value to anyone other than the Debtors. The corporate secretary maintains the minute books of the Debtors at the offices of his law firm, Cooley LLP, 101 California St. #5, San Francisco, CA 94111.

36. With respect to Local Rule 1007-2 (a) (11), I am not aware of any litigations or arbitrations pending or threatened against the Debtors.

37. With respect to Local Rule 1007-2 (a) (12), I am the sole director of each of the Debtors. I have been a director of both Debtors since they were incorporated in 2015, and I was an officer of both Debtors until recently. As a director, I oversee the business operations of the Debtors, as well as their long-term business strategy. The only officer of the Debtors is the corporate secretary of each, who is David Young, a lawyer with Cooley LLP. David has been the corporate secretary of both Debtors since their incorporation. He is responsible for maintaining the corporate minute books.

38. With respect to local Rule 1007-2(b), at present that Debtors are operating in a wind down mode. They are not currently accepting any new business, but they do continue to actively pursue the collection of receivables at Media. The Debtors have no employees, and do not pay a salary to either myself, as director, or the corporate secretary. Accordingly, there is no weekly payroll or any proposed payments to officers, stockholders or directors over the next 30 days. The only source of cash receipts is the collection of receivables, which is unpredictable. The only expected disbursements are for professional fees, and none will be paid over the next 30 days. If the Chapter 11 Cases are successful in restructuring and in collecting receivables of the Debtors, and the affiliates' Administrations are successful, the Debtors could conceivably restart their businesses.

## PART IV

### Statement Pursuant to 11 U.S.C. §1116 (1) (B)

39. I am advised that each of the Debtors qualifies as a small business case, and as such, must append its most recent balance sheet, statement of operations, cash flow statement and Federal income tax return to its petition. I am further advised the Debtors have so appended the most recent balance sheet, statement of operations, and Federal income tax return.

40. I hereby state under penalty of perjury that to the best of my knowledge, no cash flow statement has been prepared for either Media or Operations. Accordingly, there is no cash flow statement appended to either petition.

## CONCLUSION

I hereby declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other further relief as this Court deems just and proper.

Dated: October 25, 2018

At:  Melbourne, Victoria,                    ___s//Matthew Berriman_____

 Australia_____                        Matthew Berriman,
                                             Sole Director of
                                             UNLOCKD MEDIA, INC. and
                                             UNLOCKD OPERATIONS US INC.